*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 15-CT-880

09/21/2017

FILED
District of Columbia
Court of Appeals

*Julio Castillo*
Clerk of Court

JEREMY JAMAINE OSBORNE, APPELLANT,

V.

DISTRICT OF COLUMBIA, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CTF-14118-13)

(Hon. Frederick Sullivan, Magistrate Judge)
(Hon. John Ramsey Johnson, Reviewing Judge)

(Argued October 21, 2016                    Decided September 21, 2017)

*Nigel A. Barrella* for appellant.

*Janice Y. Sheppard*, Assistant Attorney General, with whom *Karl A. Racine*, Attorney General for the District of Columbia, *Todd S. Kim*, Solicitor General, and *Rosalyn Calbert Groce*, Deputy Solicitor General, were on the brief, for appellee.

Before FISHER and THOMPSON, *Associate Judges*, and STEADMAN, *Senior Judge*.

FISHER, *Associate Judge*:  Appellant Jeremy J. Osborne was convicted of operating a motor vehicle after his driver's license had been revoked ("OAR").  At his bench trial, Mr. Osborne presented evidence that he had not received notice

informing him of the revocation before his arrest. Mr. Osborne contends that, under these circumstances, the District was obligated to show that it had sent him notice before he could be convicted of OAR. We clarify the legal standard that applies and remand the case for a new trial.

## I. Factual and Procedural Background

On August 10, 2013, Metropolitan Police Officer Michael Acevedo pulled over Jeremy Osborne's vehicle because he had failed to signal a lane change. After checking the vehicle's registration and calling a dispatcher for confirmation, Officer Acevedo determined that Mr. Osborne's District of Columbia ("D.C." or "District") driver's license had been revoked. Officer Acevedo arrested Mr. Osborne for operating after revocation in violation of D.C. Code § 50-1403.01 (e) (2012 Repl.).

At trial before Magistrate Judge Sullivan, Mr. Osborne claimed that he did not know that his license had been revoked until Officer Acevedo arrested him. The revocation was not a complete surprise, however. Mr. Osborne testified that in April 2013 he had been tried for—and subsequently convicted of—"a version of DUI in Virginia." His attorney in that case "told [him] that the [Department of

Motor Vehicles ("DMV")] in Virginia might contact the D.C. DMV" to report the Virginia conviction. Not knowing exactly the consequences he faced in the District or when they might occur, Mr. Osborne called the D.C. DMV once in May 2013 to ask if there was "anything wrong with [his] D.C. license." He testified that a DMV employee told him "no."

In early June 2013 Mr. Osborne again inquired about the status of his license, this time after he was pulled over in the District for driving with one of his lights out. A police officer reportedly told him that "there was nothing wrong" and "just gave me my license back." According to Mr. Osborne, he did not receive anything in the mail regarding the revocation of his license.

Mr. Osborne explained at trial that his mother, Aleah Osborne, would have a record of any communications that had arrived at their home from the D.C. DMV. Ms. Osborne testified that she called the D.C. DMV "just about every day" from the time of her son's trial in Virginia to the time of his arrest in the District on August 10, 2013. Each time, employees "told [her] that he didn't have a problem

with his license."[1]  She occasionally communicated the employees' reassurances to her son.

The prosecutor "acknowledge[d] that the defendant made attempts to find out the status of his driving privileges," calling such attempts "commendable." She nonetheless maintained that "operating after revocation does not require knowledge that the defendant knew that his license had been revoked.  It merely requires that he was in fact operating a motor vehicle[,] which the defendant does not deny[,] and that at the time his license had been revoked."  Officer Acevedo had established that Mr. Osborne was operating a vehicle on August 10, 2013, and appellant's driving record, which the District had entered into evidence, showed that his driving privileges had been revoked "as of" July 4, 2013.

Mr. Osborne's driving record also noted other details about the revocation of his license.  It showed a "withdrawal end date" of December 31, 2013.  It also displayed two reasons for revocation:  (1) "more than or equal to 12 points" and (2) "driving while intoxicated, 1st offense."  One section recorded a citation date of

---

[1]  The District objected to Ms. Osborne's testimony regarding what the D.C. DMV employees told her about the status of her son's driver's license, calling it hearsay.  Judge Sullivan agreed to hear that testimony "only because . . . it m[ight] mitigate sentencing" if he found Mr. Osborne guilty.

March 3, 2013, for Mr. Osborne's DUI offense in Virginia, and a disposition date of May 23, 2013. Nothing on the record established when the D.C. DMV received the record of conviction; when the DMV made the decision to revoke Mr. Osborne's license; or whether (and, if so, when) notice of the revocation was sent to Mr. Osborne.

Judge Sullivan opined that the "nub" of this case was whether Mr. Osborne should have "driven knowing that he didn't really know the status of his driver's license." He commented that "[a] driver's license isn't a right. It is a privilege . . . you have to jump through the hoops to be able to do it." Moreover, the repeated inquiries to the D.C. DMV about the status of Mr. Osborne's license indicated that "they felt it could be revoked[.]" Judge Sullivan concluded that "there was enough notice to get out from underneath this absolute liability prohibition." He expressed sympathy that Mr. Osborne "got caught in . . . the transfer," but remarked that his Virginia lawyer had warned Mr. Osborne to "be careful." Since "his conviction out in Virginia trigger[ed] this reciprocity business with the [D.C.] DMV," Judge Sullivan rejected Mr. Osborne's due process defense and found him guilty of OAR, as the judge believed "the law . . . require[d]."

Mr. Osborne filed a motion for review of the judgment. Quoting a footnote in *Loftus v. District of Columbia*, 51 A.3d 1285 (D.C. 2012), Mr. Osborne argued that although OAR is a strict liability offense, "where the defendant presents some evidence that he or she had no notice of suspension and had no idea that the permit had been suspended," the District has an "obligation to at least present proof that the constitutionally requisite notice of suspension was properly sent." *Id.* at 1289–90 n.10. After reviewing the record, Judge Johnson concluded that the trial judge had "reject[ed] the credibility of assertions by Defendant and Ms. Osborne that Defendant did not know there was a problem with his license in the District," which placed Mr. Osborne's situation outside the realm of cases addressed in the *Loftus* footnote.[2] Finding no reason to reverse Judge Sullivan's credibility determinations, Judge Johnson denied Mr. Osborne's motion.[3]

## II. Legal Analysis

---

[2] We see nothing in Judge Sullivan's findings to support the conclusion that he had discredited this testimony.

[3] Judge Johnson also rejected Mr. Osborne's claim that Judge Sullivan erred in admitting into evidence his certified driving record. Mr. Osborne has not challenged that ruling here.

The Fifth Amendment provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. It is well-settled that "[s]uspension of issued [driver's] licenses . . . involves state action that adjudicates important interests of the licensees" and, thus, "licenses are not to be taken away without . . . procedural due process." *Bell v. Burson*, 402 U.S. 535, 539 (1971).[4] Generally, "due process requires that when a State seeks to terminate an interest . . . it must afford 'notice and opportunity for hearing appropriate to the nature of the case' before the termination becomes effective." *Id.* at 542 (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 313 (1950)). "[N]otice is 'constitutionally sufficient if it was reasonably calculated to reach the intended recipient when sent.'" *Kidd Int'l Home Care, Inc. v. Prince*, 917 A.2d 1083, 1086 (D.C. 2007) (quoting *Jones v. Flowers*, 547 U.S. 220, 226 (2006)).

This case requires us to focus on whether, and if so when, the elements of OAR should be expanded to require proof that the District sent notice of revocation to a driver. We first address the District's contention that our case law establishing that OAR is a strict liability offense forecloses such an inquiry.

---

[4] *Bell* specifically discussed procedural due process guaranteed by the Fourteenth Amendment, which applies only to the states and not to the District of Columbia. *See Bolling v. Sharpe*, 347 U.S. 497, 499 (1954). But the District is bound by the same obligations under the Fifth Amendment. *See id.*

## A. *Santos* and *Loftus*

In *Santos v. District of Columbia*, 940 A.2d 113 (D.C. 2007), this court held "that operating a motor vehicle without a permit in violation of D.C. Code § 50-1401.01(d) is a strict liability offense that does not require scienter. To convict Santos of that offense, therefore, the District did not have to prove that he knew his Virginia driver's license had been suspended." *Id.* at 118. That is, "knowledge and intent are not elements of the offense." *Id.* at 114–15. We recognized, moreover, that "requiring the government to muster evidence proving the non-compliant motorist's culpable mental state beyond a reasonable doubt would impair the effectiveness of the criminal sanction for violating the permit requirement." *Id.* at 117.

Five years later, in *Loftus*—and bound by *Santos*—we reviewed a conviction for violating the statute at issue here. That statute provides:

> Any individual found guilty of operating a motor vehicle in the District during the period for which the individual's license is revoked or suspended, or for which his right to operate is suspended or revoked, shall, for each such offense, be fined not more than the amount set

forth in § 22-3571.01 or imprisoned for not more than 1 year, or both.

D.C. Code § 50-1403.01 (e).  On its face, this language does not require proof that the motorist acted with knowledge or intent.

Nevertheless, Ms. Loftus argued that the District should have had to prove "that she knew or had reason to know that her license was suspended before she was arrested." *Loftus*, 51 A.3d at 1286.  We observed that "the facts and reasoning of *Santos* [we]re not meaningfully distinguishable" on the question of whether the legislature intended to include a *mens rea* element.  *Id.* at 1287, 1289.  Thus, we concluded that operating after suspension ("OAS") is also a strict liability offense. *Id.* at 1286.  We added, however:

> We here deal only with the issue whether, as an across-the-board matter, the government must in all cases prove notice or knowledge as an element of the offense of OAS.  We do not address a situation where the defendant presents some evidence that he or she had no notice of suspension and had no idea that the permit had been suspended.  In such a scenario, not present here, the government, similar to instances where self-defense is raised, may well have the obligation to at least present proof that the constitutionally requisite notice of suspension was properly sent.

*Id.* at 1289–90 n.10.

Mr. Osborne argues that his is "the exact scenario envisioned by the court" in *Loftus*, as he provided evidence that he had no notice that his D.C. license had been revoked. He asks this court to adopt the language from *Loftus* as a holding and to reverse his conviction because the government supplied no evidence that he had been sent the requisite notice of revocation. For its part, the District contends that we cannot adopt the *Loftus* footnote as a holding without trampling on the settled rule that operating after revocation requires no proof of *mens rea*.[5]

We disagree with the District's assertion that *Santos* and *Loftus* foreclose Mr. Osborne's argument. Those cases focused on one narrow question of statutory interpretation: whether knowledge and intent were elements of the offense. *See Santos*, 940 A.2d at 116–18; *Loftus*, 51 A.3d at 1288–90. As we understand it, Mr. Osborne's request is (perhaps subtly) different. He has not demanded proof

---

[5] Mr. Osborne effectively concedes that *Loftus* (which involved OAS) establishes the *mens rea* requirement for OAR. We agree. Although "suspension" and "revocation" have different meanings, *see* 18 DCMR § 9901.1, OAS and OAR are functionally the same offense as they criminalize the same conduct, violate the same statute, and share the same elements. *See* D.C. Code § 50.1403.01 (e); *see also* Criminal Jury Instructions for the District of Columbia, No. 6.403 (5th ed. rev. 2013).

that he actually knew his license had been revoked. Rather, following dictum in *Loftus*, he argues that in some circumstances the District should be required to demonstrate that it sent him notice of an important development—that his driving was no longer authorized by the District but would now be considered criminal conduct. Neither *Santos* nor *Loftus* rejected this argument.[6] Indeed, *Loftus* plainly advised that the door to such a rule remained open.

## B. What Process Is Due?

But *Loftus*'s cursory suggestion that a rule of this sort might be appropriate does not settle the matter. Footnote 10 of *Loftus* contained no holding and, thus,

---

[6] The defendants in *Santos* and *Loftus* did not contest whether the issuing jurisdictions had complied with governing regulations when suspending their licenses. *See Santos*, 940 A.2d at 115 ("The official record revealed that Santos's Virginia driver's license was suspended on November 10, 2004. . . . Santos did not dispute th[is] fact[], nor did he contest the legality or the effective date of his November 10 suspension."); *Loftus*, 51 A.3d at 1289 n.10 (noting that *Loftus* did not "address a situation where the defendant presents some evidence that he or she had no notice of suspension and had no idea that the permit had been suspended"). In *Santos*, the record showed that the Commonwealth of Virginia had sent notice of suspension even though it was not clear whether Mr. Santos had actually received it. *Santos*, 940 A.2d at 116 ("The somewhat cryptic driver history record further states that notification of the suspension was mailed to Santos but was 'unclaimed,' indicating that he did not receive it."). In *Loftus*, the defendant objected to the admission of her driver's record, which referred to potentially prejudicial, prior DUI convictions. *Loftus*, 51 A.3d at 1286. Instead, the parties stipulated that her license was suspended on a particular date. *Id.*

has no binding effect. *See Alfaro v. United States*, 859 A.2d 149, 154 n.8 (D.C. 2004) ("Language in an opinion which 'constitutes obiter dictum, entirely unnecessary for the decision of the case . . . [has] no effect as indicating the law of the District.'" (alterations in original) (quoting *Albertie v. Louis & Alexander Corp.*, 646 A.2d 1001, 1005 (D.C. 1994))). Accordingly, we must independently consider the propriety of such a rule.

Mr. Osborne does not argue that the District's current processes for revoking a driver's license are constitutionally deficient. As best we can tell, he asks only that the District follow its own procedures, and we focus our attention accordingly. *See Gay Rights Coal. of Georgetown Univ. Law Ctr. v. Georgetown Univ.*, 536 A.2d 1, 16 (D.C. 1987) ("If there is one doctrine more deeply rooted than any other, it is that we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable." (alteration in original) (quoting *Spector Motor Servs., Inc. v. McLaughlin*, 323 U.S. 101, 105 (1944))). We describe the District's system for revoking a license based on a motorist's out-of-state conviction, then address disputes between the parties about what it requires with regard to notice and an opportunity to be heard.

### i. The Statutory and Regulatory Framework.

District statutory law provides that:

> Except where for any violation of this subchapter revocation of the operator's permit is mandatory or where suspension or revocation is mandatory for accumulated point totals pursuant to Chapter 3 of Title 18 of the District of Columbia Municipal Regulations, the Mayor or his designated agent may revoke or suspend an operator's permit for any cause which he or his agent may deem sufficient; provided, that in each case where a permit is revoked or suspended the reasons therefor shall be set out in the order of revocation or suspension; provided further, that such order shall take effect 10 (15, if the person is a nonresident) days after its issuance. . . .

D.C. Code § 50-1403.01 (a). Regulations flesh out revocation procedures.

Chapter 3 of Title 18 of the District of Columbia Municipal Regulations requires the Director of the D.C. DMV to revoke a motorist's driver's license in certain circumstances. One section instructs the Director to "forthwith revoke the license of any person upon receiving a record of such person's conviction" of driving under the influence or another of several enumerated offenses. 18 DCMR

§ 301.1; *see also id.* § 300.6.[7] Another section establishes a system under which the DMV assesses points against a motorist's driving record "upon receipt of evidence of a traffic conviction." *Id.* § 303. When a driver accumulates twelve points, "[t]he Director or hearing examiner shall order the revocation of the person's license." *Id.* § 303.5. The DMV assesses twelve points for some individual convictions, including driving under the influence. *Id.* § 303.2 (m), (n). Neither party disputes that Mr. Osborne's driver's license was subject to mandatory revocation upon the D.C. DMV's receipt of the record of his conviction in Virginia. And Mr. Osborne's driving record reveals that his license was revoked under both procedures as he had accumulated twelve points under the District's system and had been convicted of driving under the influence, an offense for which revocation is mandatory.

If a driver's license has been revoked, regulations require that the licensee "immediately return the license to the [DMV]." *Id.* § 305.4; *see also id.* § 305.3

---

[7] The District is a member of the Driver's License Compact ("DLC"), an interstate agreement to share information concerning traffic-related convictions and license suspensions and revocations. D.C. Code § 50-1001 (2012 Repl.). Under the DLC, "[t]he licensing authority in the home state, for the purposes of suspension, revocation or limitation of the license to operate a motor vehicle, shall give the same effect to the offense reported . . . as it would if such offense had occurred in the home state, in the case of conviction[] for . . . [d]riving a motor vehicle while under the influence." *Id.*, Art. IV (a)(2).

("The Director upon canceling, suspending or revoking a license shall require that the license shall be surrendered to and retained by the [DMV]."). Provided that the driver complies with other requirements when seeking reinstatement, a driver's license is revoked only for a specified period of time. For commission of a first offense for which revocation is mandatory, a driver faces a "minimum revocation period" of six months. *Id.* § 306.4. The penalties increase to one year and two years, respectively, for second and third offenses. *Id.* § 306.5. "Each person whose license has been revoked shall be eligible to apply for restoration of privileges at the expiration of the period for which the privileges have been revoked." *Id.* § 306.8.

When the Director proposes to revoke or suspend a license under his or her discretionary authority, a motorist may petition for a hearing on the proposed action. *Id.* § 309. However, "[a] person is not entitled to a hearing when the action taken by the Director is made mandatory by law or when the person has previously been afforded an opportunity with appropriate notice for a hearing." *Id.* § 1005.4.

The District's regulatory scheme also includes a section entitled "Notice of Suspension or Revocation," *id.* § 307, which is divided into seven subsections. Section 307.1 requires that when a license is mandatorily revoked as a

consequence of a conviction for a traffic offense, "an order of revocation shall be prepared setting forth the *proposed* action and the grounds therefor in sufficient detail to permit the person to understand fully the nature of the order and the reason for the order." *Id.* § 307.1 (emphasis added). It also notes that the order "shall include complete information on the manner in which that person may seek restoration of the license." *Id.* Section 307.2 explains that when a license is revoked due to the accumulation of traffic points, "[t]he notice shall notify the person that the order will take effect within ten (10) days . . ., unless that person files a written objection . . . based solely upon the accuracy of the driving record." *Id.* § 307.2. Section 307.3 provides that when the DMV intends to revoke a license under its discretionary authority, "a notice of proposed suspension or revocation shall be prepared setting forth the proposed action and the grounds for the proposed action in sufficient detail to permit that person to understand fully the nature of the proposed action and the reasons for the proposed action." *Id.* § 307.3.

The remaining three subsections appear to establish rules applicable to all suspensions and revocations. Section 307.4 states:

> The notice shall take effect within ten (10) days . . . unless that person files a written petition with the Director for a hearing in which the Director must prove sufficient grounds for the proposed action. . . . The filing

of such a demand does not operate as a stay of such order when the order has been issued revoking or suspending a permit . . . for driving . . . while under the influence of intoxicating liquor or any drug or any combination thereof. . . . Each notice issued pursuant to this section shall inform the respondent of the effective date of the notice and the right to a hearing.

*Id.* § 307.4. Section 307.5 explains that a "notice or order" served under the rule is "properly served" if the motorist is personally served or if a copy of the notice is mailed to the motorist's last known address. *Id.* § 307.5. Section 307.6 defines last known address. *Id.* § 307.6. Finally, § 307.7 provides that "[p]roof of service of any notice or order in the manner specified by this section may be made by the certificate or affidavit of any officer or employee of the District, naming the person on whom the notice or order was served and specifying the time, place, and manner of service." *Id.* § 307.7.

## ii. Notice of Revocation Was Required.

The parties disagree about whether the District's regulatory scheme entitled Mr. Osborne to notice that his license would be revoked. Mr. Osborne contends that the regulations require notice even if revocation was based on conduct fairly determined in an out-of-state proceeding. He also argues that, in any event, the

Due Process Clause mandates that the District send notice in these circumstances. The District argues that Mr. Osborne received all the notice to which he was entitled: he had actual knowledge that he had been convicted of driving under the influence in Virginia, he was charged with knowledge of District law requiring revocation of his driver's license upon the DMV's receipt of the record of his Virginia conviction, and his lawyer in the Virginia case had warned him that he might face driving restrictions in the District. Furthermore, the District maintained that its DMV was to "forthwith revoke" the license, 18 DCMR § 301.1, not to afford Mr. Osborne additional notice.

While the statutory and regulatory provisions are far from a model of clarity,[8] Mr. Osborne has the better of the argument as to what these provisions by their own terms require; hence, we do not reach any argument based on

---

[8] Among other difficulties, neither "order" nor "notice" is defined. In some instances, the terms are used seemingly interchangeably. *Compare* 18 DCMR § 307.2 ("The notice shall notify the person that the order will take effect within ten (10) days"), *with* § 307.4 ("The notice shall take effect within ten (10) days."). Furthermore, § 307.2's explicit mention of notice in the context of revocations due to an accumulation of points might suggest that notice is not sent in other circumstances. But § 307.4, which seems to apply to all revocations, at least implies that notice is sent in a broader range of situations. The record before us contains no statement from the D.C. DMV regarding how to interpret these regulations. On remand, the District is free to seek and supply the D.C. DMV's interpretation of these and other relevant provisions.

constitutional due process. Under the District's own scheme, it was required to send notice to Mr. Osborne.[9] The District's position to the contrary is premised on the idea that a motorist is obligated to refrain from driving once he is convicted in an out-of-state proceeding, when his license becomes *subject to* revocation. This simply is not so. The regulations clearly provide that the District's authority and obligation to revoke do not arise until it has received an official record of the out-of-state conviction. *See id.* §§ 301, 303. Likewise, under the regulations, a motorist shall not "drive a motor vehicle on any public highway in the District at any time *when* his or her privilege to do so is suspended or revoked." *Id.* § 305 (emphasis added). No provision brought to our attention supports the District's argument that a licensed driver's responsibility to refrain from operating a vehicle arises at some point before the District acts to revoke his or her license. In this case, the driving record itself states that the revocation of Mr. Osborne's license was to start July 4, 2013.

---

[9] At oral argument, Mr. Osborne's counsel represented that he had procured a copy of the order of revocation prepared in this case. But he could find no certificate of service to clarify whether that order or other notice had been sent to Mr. Osborne. He also commented that the order was created ten days before it was to take effect on July 4, 2013.

The notice provisions reinforce Mr. Osborne's argument. First and most significantly, § 307.2 unambiguously provides for notice when a license is revoked due to an accumulation of points. As this was one of the reasons Mr. Osborne's license was revoked, he was entitled to notice. Second, these sections plainly contemplate that the District will articulate in writing its reasons for revoking a driver's license, even when revocation is mandatory. *See, e.g.*, *id.* § 307.1 (requiring articulation "in sufficient detail to permit the person to understand fully the nature of the order"). It is difficult to understand why thorough articulation would be necessary unless the notice would be sent to the motorist.

Relying on this triggering event is not a mere formality. The periods of revocation described in § 307 must have beginning and ending dates to be at all meaningful. Although it might be prudent to follow the approach the District advocates, doing so would result in either the imposition of an unauthorized pre-revocation penalty or an arbitrary extension of these periods of revocation. Here, Mr. Osborne was convicted in Virginia in May 2013, but he could not control when the record of that conviction would be sent, received, and recorded. Nor could he predict when the District would act on that information. His D.C. driving record specified that the period of withdrawal of his license was set to begin on

July 4, 2013, and to end on December 31, 2013. Under the District's position, however, Mr. Osborne apparently was to stop driving at least a month earlier.

The District's reading of these provisions also undercuts the requirement that a driver must "immediately" return a revoked license. *Id.* § 305.3. If a driver cannot even reliably determine whether his license has been revoked, he cannot be expected to return the license immediately after revocation. Moreover, as a practical matter, notice serves the important function of alerting a driver to an erroneous suspension or revocation (due, perhaps, to a confusion of names) and enables him or her to contest the District's action before facing criminal prosecution.

### iii. A Hearing Was Not Required.

Mr. Osborne also argues, for the first time on appeal, that he was entitled to a hearing before his license could be revoked. We disagree. District regulations unmistakably reject this argument. *See* 18 DCMR § 1005.4 (no entitlement to a hearing when a license is subject to mandatory revocation). And this court has held that "the Full Faith and Credit Clause, U.S. Const. art. IV § 1, allows the District to 'adopt for purposes of its own compliance with due process, the

judgment of a court from another state,' . . . rather than hold a new hearing." *Wall v. Babers*, 82 A.3d 794, 802 (D.C. 2014) (citation omitted) (quoting *Tomai-Minogue v. State Farm Mut. Auto. Ins. Co.*, 770 F.2d 1228, 1232 (4th Cir. 1985)). Furthermore, it is unclear what purpose a hearing would serve in this case. Mr. Osborne conceded at trial that he had been convicted of a DUI offense in Virginia, and he does not dispute that his conviction subjected him to mandatory license revocation in the District. He has pointed to no factual dispute that might be resolved in a hearing. We have previously rejected the notion that due process requires empty process. *See, e.g.*, *Wall*, 82 A.3d at 802–03 (rejecting due process challenge to District's refusal to provide a hearing on driver's license renewal where "there were no contested facts that needed to be resolved at a post-deprivation hearing").

## C. When Is Proof of Notice Required?

Having established that Mr. Osborne was entitled to notice, we next consider whether and in what circumstances the District should be required to verify that it provided this notice.

While none of our prior decisions has squarely addressed the question confronting us here, a few have presumed in dictum that the District and other jurisdictions comply with the requirements of due process before revoking licenses. In *Santos*, we "perceive[d] no serious risk that strict liability for driving without a permit [would] encompass 'entirely innocent conduct'" because "a driver's license cannot be suspended or revoked without due process, including both fair notice of a traffic violation charge and the potential penalties, and the right to a hearing." 940 A.2d at 117. And in *Loftus*, we remarked that "the District of Columbia has a well-defined system for providing notice and a hearing before licenses are suspended." 51 A.3d at 1289. Moreover, we have discussed at length the regulations which provide such process.

We have no doubt that in the mine run of cases, these presumptions reflect reality. Usually, there will be no need to prove that notice was sent. But where a defendant claims that he or she did not receive notice of revocation and the evidence fairly raises the issue, we would be remiss to presume away rational doubts about whether the District actually satisfied its regulatory obligation to give notice. In these situations, the District controls the means for transforming conduct that once was innocent into a criminal violation; it also controls information about when that prohibition is set to begin. We should not demand that licensed

motorists stop driving before they receive the notice they are due. And we have no qualms about requiring more from the District in the way of proof at trial under these circumstances.

This holding is intentionally limited, however. We are not retreating from our earlier conclusion that prosecution for OAR or OAS may not be used as a vehicle to collaterally attack the revocation of a license. *See Abbott v. District of Columbia*, 154 A.2d 362, 362–63 (D.C. 1959) ("[A]ppellant . . . sought to make a collateral attack on the order of the [DMV], and this cannot be done."). A driver who has received notice that his license has been revoked or suspended may not continue driving until arrested and then defend by claiming that the order of revocation was invalid. *See id.* As we explained in *Abbott*, that driver must challenge the revocation through administrative channels. *Id.* at 363 ("If he felt there was some invalidity in the proceeding he should have taken the steps provided by law to correct it. He had no right to continue to operate a vehicle until apprehended and then make a belated attack upon the revocation order."); *accord*, *Foster v. District of Columbia*, 497 A.2d 100, 103 (D.C. 1985) ("Because of appellant's failure to pursue his administrative remedies, the hearing examiner's decision sustaining his suspension must be considered conclusive. Appellant may not now mount a collateral attack on that decision." (citation omitted)).

We therefore hold that, when a defendant claims that he or she did not receive notice of revocation and the evidence fairly raises the issue,[10] the District bears the burden of proving beyond a reasonable doubt that sufficient notice of revocation was given.[11] The District may discharge this obligation by, for example, introducing proof of service of a notice or order sent in compliance with § 307. *Cf. Foster*, 497 A.2d at 102 ("We need not decide whether notice of a suspension is a necessary element of the offense, for we conclude that there was sufficient evidence adduced at trial to permit the jury to find that adequate notice was given."). The District need not demonstrate that a letter was actually received,

---

[10] This evidence need not (necessarily) be produced by the defense. *Cf. Henry v. United States*, 94 A.3d 752, 757 (D.C. 2014) (noting that evidence supporting a self-defense instruction "may be an amalgam of 'portions . . . of the government's evidence and [portions] of defense evidence'" (alterations in original) (quoting *Hernandez v. United States*, 853 A.2d 202, 206 n.4 (D.C. 2004))).

[11] In *Loftus*, we described this "some evidence" showing as "similar to instances where self-defense is raised." *Loftus*, 51 A.3d at 1289 n.10. That comparison remains apt—though, we admit, imperfect. In the typical prosecution for simple assault, the government does not have to disprove self-defense. When such a claim is made, however, a trial judge must determine "whether there [i]s any evidence that fairly raise[s] the issue of self-defense." *Guillard v. United States*, 596 A.2d 60, 63 (D.C. 1991). If so, "the government is required to disprove that the defendant acted in self-defense beyond a reasonable doubt." *Ewell v. United States*, 72 A.3d 127, 130 (D.C. 2013). In essence, a new element of proof is added. As in that context, no additional showing is mandated here unless the evidence fairly raises the issue of whether notice was sent.

opened, or otherwise acknowledged. *Cf. Kidd Int'l Home Care, Inc.*, 917 A.2d at 1087 (noting that the common law mailbox rule "creates a rebuttable presumption that a letter properly addressed, stamped, and mailed, and not returned to the sender, has been delivered to the addressee."). Moreover, as *Santos* and *Loftus* establish, the government does not have to prove that the defendant acted knowingly or intentionally. We do not anticipate that this modest requirement will greatly burden the District or impair the effectiveness of the criminal sanction. After all, this showing requires only proof that the District complied with its own regulations.

### III. Conclusion

This court grants retroactive application to "new rule[s] for the conduct of criminal prosecutions" in all cases pending on direct review. *Boone v. United States*, 769 A.2d 811, 824 (D.C. 2001) (quoting *Johnson v. United States*, 520 U.S. 461, 467 (1987)). Accordingly, we vacate appellant's conviction and remand this case for a new trial.[12] If he so chooses, Mr. Osborne can present his lack-of-notice defense for the trial court to evaluate under the clarified legal standard.

---

[12] We reject Mr. Osborne's suggestion that a retrial should be precluded because the evidence did not establish that the District sent him notice that his

(continued…)

*It is so ordered.*

---

(…continued)

license had been revoked. Like many other courts, we decline to prohibit retrial where a post-trial change in the law has altered the elements of proof. *See, e.g.*, *United States v. Robison*, 505 F.3d 1208, 1225 (11th Cir. 2007); *United States v. Ellyson*, 326 F.3d 522, 533 (4th Cir. 2003) ("Any insufficiency in proof was caused by the subsequent change in the law . . ., not the government's failure to muster evidence."); *United States v. Wacker*, 72 F.3d 1453, 1465 (10th Cir. 1996); *United States v. Weems*, 49 F.3d 528, 530–31 (9th Cir. 1995). "Remanding for retrial in this case does not give the government the opportunity to supply evidence it 'failed' to muster at the first trial. . . . The government had no reason to introduce such evidence because, at the time of trial, under the law of our circuit, the government was not required to prove [the new element]." *Weems*, 49 F.3d at 531.